THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **3:23-CR-60** |
| | : | **(JUDGE MARIANI)** |
| WILLIAM CHARLES DAVIS, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.  INTRODUCTION AND PROCEDURAL HISTORY

On March 21, 2023, a federal grand jury returned a one-count Indictment charging Defendant William Charles Davis with being a Prohibited Person in Possession of Firearm, in violation of 18 U.S.C. § 922(g)(1).[1]  (Doc. 1).  The Indictment also included a forfeiture allegation for the 13 firearms seized from Davis on January 6, 2023.  Defendant Davis subsequently filed a Motion to Dismiss the Indictment (Doc. 22) and supporting brief (Doc. 23) on August 16, 2023, asserting that § 922(g)(1) is facially unconstitutional, as well as unconstitutional as-applied to the defendant, in light of the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) and the Third Circuit Court of Appeals' June 6, 2023 decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) applying the test set forth by the Supreme Court in *Bruen*.  The Government

---

[1] Defendant Davis was convicted of possession of a sawed-off shotgun, a felony in violation of South Carolina Code § 16-23-230 in November of 2015 and was subsequently convicted of felony larceny, in violation of North Carolina General Statute § 14-72, in January of 2016.  (*See* Doc. 29).

timely filed a Brief in Opposition to the Motion to Dismiss (Doc. 26), to which Defendant filed a Reply Brief (Doc. 27). Defendant's Motion to Dismiss is now ripe for resolution.

For the reasons set forth herein, the Court will deny Defendant's Motion to Dismiss the Indictment (Doc. 22).

## II. ANALYSIS

### A. The *Bruen* and *Range* Decisions

The Second Amendment of the U.S. Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Bruen*, the Supreme Court, consistent with its precedent, re-affirmed that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)); *see also, id.* at 2122 ("In [*Heller* and *McDonald*] we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense.").

Although the Second Amendment confers an individual right to keep and bear arms, this right is "not unlimited". *Heller,* 554 U.S. at 595, 626. As the Supreme Court in *Heller* explained:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . For

2

example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627 (internal citations omitted).  *See also*, *McDonald*, 561 U.S. at 786 ("We made

it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory

measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws

forbidding the carrying of firearms in sensitive places such as schools and government

buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'

We repeat those assurances here.") (internal citation omitted).[2]

In examining its precedent, the Supreme Court in *Bruen* set forth the appropriate test

a Court must apply in determining whether a firearm regulation violates the Second

Amendment:

In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this

---

[2] When setting forth the above-quoted "longtime prohibitions" and explicitly warning that nothing in its opinion "should be taken to cast doubt" on these longstanding prohibitions, the *Heller* Court titled these prohibitions as "*presumptively* lawful regulatory measures."  *Heller*, 554 U.S. at 627 n. 26 (emphasis added).  Nonetheless, two years later in *McDonald*, the Supreme Court confirmed the continued validity of its statement in *Heller* as to the legality of the longtime prohibitions, without the re-iteration or inclusion of any qualifying language.

Nation's historical tradition may a court conclude that the individual's conduct
falls outside the Second Amendment's unqualified command.

*Bruen*, 142 S.Ct. at 2126 (internal quotation marks omitted). *See id.* at 2127 ("the

government must affirmatively prove that its firearms regulation is part of the historical

tradition that delimits the outer bounds of the right to keep and bear arms."); *id*. at 2130 (re-

iterating the standard for applying the Second Amendment).  A Court must therefore first

address the threshold question of whether the Second Amendment's plain text covers the

individual's conduct at issue and, if it determines the conduct is covered, engage in an

analysis of whether the Government has affirmatively demonstrated that the regulation at

issue is consistent with this Nation's historical tradition of firearm regulation.

In *Range v. Attorney General*, Bryan Range sought a declaration that § 922(g)(1)

violated the Second Amendment as applied to him and requested an injunction prohibiting

the law's enforcement against him.  Applying the principles of *Bruen*, the Third Circuit first

answered in the affirmative the "threshold question" of whether Range is one of "the people"

protected by the Second Amendment, reasoning that "the people" "refers to all members of

the political community" and Second Amendment rights "presumptively 'belong[] to all

Americans.'"  *Range*, 69 F.4th at 101 (quoting *Heller*, 554 U.S. at 580, 581).  The Circuit

Court then turned to the first step of the *Bruen* analysis – whether the Second Amendment's

plain text covers the individual's conduct at issue – finding that § 922(g)(1) does regulate

Range's request to possess a rifle to hunt and a shotgun to defend himself at home and

therefore the Second Amendment presumptively protects Range's conduct.  *Id.* at 103.

4

Having determined that Range's conduct was protected by the Second Amendment, the Circuit Court engaged in the second step dictated by *Bruen*: an analysis of whether the Government had affirmatively demonstrated that it was justified in "applying § 922(g)(1) to Range 'by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Range*, 69 F.4th at 103. The Third Circuit rejected each of the Government's arguments, ultimately finding that "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Id.* at 106.

## B.  Defendant's Facial Challenge to § 922(g)(1)

Here, in light of the Supreme Court's decision in *Bruen* and the Third Circuit's recent application of *Bruen* in its decision in *Range*, Defendant asserts that § 922(g)(1) is facially unconstitutional. However, *Bruen* did not invalidate, alter, or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, but instead, relying extensively on those two cases, clarified the appropriate test that must be applied in addressing Second Amendment challenges to firearms regulations. In *Bruen*, the Court rejected the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny" that had been applied by the lower courts after *Heller* and *McDonald*, holding that the second-step – application of a "means-end" analysis – "is one step too many." *Bruen*, 142 S.Ct. at 2126-2127. In so doing, the Court emphasized that "[s]tep one of the

predominant framework [determining whether regulated conduct falls beyond the Second Amendment's original scope] is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history.  But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."  *Id*. at 2127.  The Supreme Court in *Bruen* took great effort to avoid undermining its prior decisions in *Heller* and *McDonald* and to repeatedly underscore the continued validity of those decisions.  *See e.g., Bruen*, 142 S.Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id*. ("*Heller* itself exemplifies" the straight-forward inquiry into the Second Amendment's text and historical understanding); *id*. at 2132-2133 ("*Heller* and *McDonald* point toward at least two metrics [to assess whether a historical regulation is a proper analogue for a modern firearm regulation]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

Thus, the Court here does not engage in an uninformed analysis in determining whether the Second Amendment's plain text covers the possession of a firearm by a felon, and if so, whether the Government has affirmatively demonstrated that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation, where the Supreme Court in *Bruen* has already signaled the answer to this question.

The Court in *Heller* made clear that the rights secured by the Second Amendment are not unlimited, enumerating a number of examples including the "longstanding

6

prohibitions on the possession of firearms by felons". *Heller*, 554 U.S. at 626-627. The

Supreme Court's decision in *Bruen* does not undermine its statement in *Heller*. *Bruen*,

quoting *Heller*, re-iterated that "[t]he Second Amendment 'is the very *product* of an interest

balancing by the people' and it 'surely elevates above all other interests the right of law-

abiding, responsible citizens to use arms' for self-defense. It is this balance – struck by the

traditions of the American people – that demands our unqualified deference." *Bruen*, 142

S.Ct. at 2131 (quoting *Heller*, 554 U.S. at 635) (italics in original). The *Bruen* decision

further stated that "[t]hroughout modern Anglo-American history, the right to keep and bear

arms in public has traditionally been subject to well-defined restrictions governing the intent

for which one could carry arms, the manner of carry, or the exceptional circumstances

under which one could not carry arms." *Id.* at 2138. This observation in *Bruen* is entirely

consistent with *Heller*'s recognition of the legality of the "longstanding prohibitions on the

possession of firearms by felons and the mentally ill, or laws forbidding the carrying of

firearms in sensitive places such as schools and government building. . ." *Heller*, 554 U.S.

at 626-627.

The conclusion that *Bruen* does not disturb the prior analyses of *Heller* and

*McDonald* is further supported by the concurrences and the dissent in *Bruen*. Justice Alito,

in his concurrence, specifically noted the following:

> Our holding [in *Bruen*] decides nothing about who may lawfully possess a
> firearm or the requirements that must be met to buy a gun. Nor does it decide
> anything about the kinds of weapons that people may possess. <u>Nor have we
> disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that</u>

may be imposed on the possession or carrying of guns.

*Bruen*, 142 S.Ct. at 2157 (Alito, J., concurring) (underline added).  Justice Kavanaugh, with

whom Chief Justice Roberts joined, wrote separately "to underscore two important points

about the limits of the Court's decision" in *Bruen*.  The second point reads as follows:

> *Second*, as *Heller* and *McDonald* established and the Court today again
> explains, the Second Amendment "is neither a regulatory straightjacket nor a
> regulatory blank check." . . . Properly interpreted, the Second Amendment
> allows a "variety" of gun regulations. *Heller*, 554 U.S. at 636, 128 S.Ct. 2783.
> As Justice Scalia wrote in his opinion for the Court in *Heller*, and Justice ALITO
> reiterated in relevant part in the principal opinion in *McDonald*:
>
> > "Like most rights, the right secured by the Second Amendment is not
> > unlimited. From Blackstone through the 19th-century cases,
> > commentators and courts routinely explained that the right was not a
> > right to keep and carry any weapon whatsoever in any manner
> > whatsoever and for whatever purpose.... [N]othing in our opinion
> > should be taken to cast doubt on longstanding prohibitions on the
> > possession of firearms by felons and the mentally ill, or laws forbidding
> > the carrying of firearms in sensitive places such as schools and
> > government buildings, or laws imposing conditions and qualifications
> > on the commercial sale of arms. [Footnote 26: We identify these
> > presumptively lawful regulatory measures only as examples; our list
> > does not purport to be exhaustive.] . . .

*Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring).  Justice Breyer, in his dissenting

opinion, agreed with Justice Kavanaugh, stating that "[l]ike Justice KAVANAUGH, I

understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding"

addressing presumptively lawful firearm restrictions, including the prohibition of the

possession of a firearm by a felon, *id*. at 2189 (Breyer, J., dissenting).[3]

---

[3] This Court also notes Justice Alito's dissent in *New York State Rifle & Pistol Association, Inc. v.*

The concurrences and dissent in *Bruen* underscore that the Supreme Court foresaw

the legal challenges which may arise as a result of its decision, including the issues now

raised in the present motion to dismiss by the defendant. That Justices Kavanaugh,

Roberts, and Alito each determined the need to highlight the particular language in *Heller*

setting forth certain presumptively lawful "longstanding prohibitions" demonstrates a desire

to make clear the limits of the Supreme Court's decision in *Bruen* and to emphasize the

---

*City of New York*, 140 S.Ct. 1525 (2020), issued two years prior to *Bruen*. In that case, the Supreme Court vacated the judgment of the Second Circuit Court of Appeals and remanded the case for further proceedings where it deemed Petitioners' claim for injunctive relief against New York City moot because the city had altered its firearm licensing statute following the Supreme Court's grant of certiorari. In dissent, Justice Alito opined that the case was not moot and proceeded to an analysis of the merits of plaintiffs' claim that the city firearm ordinance violated the Second Amendment. Justice Alito began his analysis as follows:

> In *Heller*, we held that a District of Columbia rule that effectively prevented a law-abiding citizen from keeping a handgun in the home for purposes of self-defense constituted a core violation of the Second Amendment. 554 U.S. at 635, 128 S.Ct. 2783. We based this decision on the scope of the right to keep and bear arms as it was understood at the time of the adoption of the Second Amendment. *Id.*, at 577-605, 628-629, 128 S.Ct. 2783. We recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals. *See id.*, at 626-627, 128 S.Ct. 2783; *see also McDonald*, 561 U.S. at 787, 904, 130 S.Ct. 3020. But history provided no support for laws like the District's. *See* 554 U.S. at 629-634, 128 S.Ct. 2783.

*Id.* at 1540-1541 (Alito, J., dissenting). Justice Alito's dissent concluded by foreshadowing the Supreme Court's eventual holding in *Bruen* in 2022 rejecting the application "means-end" scrutiny. *Id.* at 1544 ("We are told that the mode of review in this case is representative of the way *Heller* has been treated in the lower courts. If that is true, there is cause for concern."). Although Justice Kavanaugh concurred with the majority in that case, he wrote separately, stating that while he agreed that the claim for injunctive relief was moot, he "agree[d] with Justice Alito's general analysis of *Heller* and *McDonald*" and "share[d] Justice Alito's concern that some federal and state courts may not be properly applying *Heller* and *McDonald*." *Id.* at 1527 (Kavanaugh, J., concurring). Justices Alito and Kavanaugh's statements in this 2020 precursor to *Bruen* further support a finding that the Supreme Court did not intend anything in *Bruen* to be interpreted as overturning or modifying its decision in *Heller*, including *Heller's* "recogni[tion] that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons and other dangerous individuals", *id.* at 1540-1541 (Alito, J., dissenting).

remaining viability of the Supreme Court's statements in *Heller* and its progeny as to

specific conduct which falls outside of the protection of the Second Amendment and which

may be properly curbed by gun regulations.

This Court acknowledges the *Range* majority's rejection of the Government's

reliance on the Supreme Court's statement in *Heller* that "nothing in our opinion should be

taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"

and the Justices' concurring and dissenting opinions in *Bruen* underscoring this statement.

*Range*, 69 F.4th at 103-104.  The Third Circuit reasoned that:

> Even if the 1938 Act [Federal Firearms Act of 1938] were "longstanding"
> enough to warrant *Heller*'s assurance – a dubious proposition given the *Bruen*
> Court's emphasis on Founding-and Reconstruction-era sources, 142 S. Ct. at
> 2136, 2150 – Range would not have been a prohibited person under that law.
> Whatever timeframe the Supreme Court might establish in a future case, we
> are confident that a law passed in 1961 – some 170 years after the Second
> Amendment's ratification and nearly a century after the Fourteenth
> Amendment's ratification – falls well short of "longstanding" for purposes of
> demarcating the scope of a constitutional right. So the 1961 iteration of §
> 922(g)(1) does not satisfy the Government's burden.

*Id*. at 104.

The Third Circuit's reasoning, in light of the test set forth by *Bruen*, seemingly leads

to the conclusion that the "presumptively lawful regulatory measures" identified in *Heller*,

most of which arguably have clearer origins in the 20th century, do not comport with the

Supreme Court's test requiring that a firearm regulation be consistent with this Nation's

historical tradition of firearm regulation in order to not violate the Second Amendment.

Nonetheless, six Justices clearly warned that the *Bruen* decision *should not* be read as

casting doubt on the validity of certain firearms regulations, including those identified in

*Heller*.  Specifically, Justices Alito, Kavanaugh, and Roberts, in concurring, all made explicit

reference to *Heller*'s enumerated lawful firearm restrictions and emphasized that the

decision in *Bruen* did not disturb this statement in *Heller*.  Additionally, the dissent, Justices

Breyer, Sotomayor, and Kagen, also noted agreement that the majority in *Bruen* did not

"cast . . . doubt" on *Heller*'s identification of "presumptively lawful firearm" restrictions.  Thus,

Defendant Davis' argument that the decisions in *Bruen* and *Range* require a finding that §

922(g)(1) is facially unconstitutional must be rejected.  *See Range*, 69 F.4th at 111 (Ambro,

J., concurring) ("Given that three Justices in *Bruen*'s majority opinion reminded us that

felon-in-possession laws remain presumptively lawful, and the three dissenting Justices

echoed that view, . . .  a sound basis exists for § 922(g)(1)'s constitutional application in a

substantial amount of cases.  Any historical inquiry that reaches a contrary result must be

wrong in view of the answer the Supreme Court has already supplied. *See* [*United States v.*]

*Jackson*, 69 F.4th [69 F.4th 495, 501-02 (8th Cir. 2023)]."); *id.* at 113 (Shwartz, J.,

dissenting) ("[T]he Supreme Court has made clear that [§ 922(g)(1)] bans are presumptively

lawful. . .").

  *Bruen* did not overturn, abrogate, or otherwise suggest that the longstanding

prohibitions identified in *Heller*, including the prohibition of possession of firearms by felons,

were no longer lawful.  In addition, the majority and concurring opinions in *Range* made

clear that their decision was narrowly tailored to as applied challenges of § 922(g)(1).  The

11

Circuit Court did not hold that § 922(g)(1) is unconstitutional on its face and instead was careful to instruct that the statute remained facially constitutional at this time. *See Range*, 69 F.4th at 106 ("Our decision today is a narrow one. Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a).") (Hardiman, J., majority); *id.* at 109 (Government's failure to carry its burden in this case "does not spell doom for § 922(g)(1)" and the statute remains "'presumptively lawful'") (Ambro, J., concurring). Thus, this Court remains bound by the Supreme Court's decision in *Heller* and its progeny and Defendant's motion to dismiss the Indictment on the basis that § 922(g)(1) is facially unconstitutional will be denied.

### C. Defendant's As-Applied Challenge to § 922(g)(1)

Defendant Davis also argues that, even if § 922(g)(1) is facially constitutional, it is unconstitutional as applied to him.

Whereas "[t]o prevail on a facial challenge [to a statute], a plaintiff must 'establish that no set of circumstances exists under which the [law] would be valid,'" the standard for bringing an as-applied challenge "is less demanding; a plaintiff need only show that a law's 'application to a particular person under particular circumstances deprived that person of a constitutional right.'" *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 134 & n.7 (3d Cir. 2022) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) then *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)).

Where the Third Circuit in *Range* found that the Government had failed to show that

12

"our Republic has a longstanding history and tradition of depriving people like Range of their firearms", *Range*, 69 F.4th at 106, this Court must begin with the fundamental observation that Davis is undeniably in no way "like Range". In determining whether § 922(g)(1) was unconstitutional as applied to Range, the Third Circuit took into consideration the underlying conviction itself (making a false statement to obtain food stamps), the purported reason for Range's actions leading to his conviction (he and his wife struggled to raise "three young children on $300 per week"), the age of the conviction (28 years old), Range's subsequent law-abiding lifestyle, and the reason Range now wanted the firearm (deer hunting and self-defense). *Range*, 69 F.4th at 98-99. Unlike Range who pleaded guilty to a state law misdemeanor over 25 years ago and who has not since engaged in criminal activity, Davis' prior convictions at issue here occurred in 2015 and 2016 and involve actual felonies, specifically the unlawful storing, keeping, or possession of a sawed-off shotgun in violation of South Carolina Code § 16-23-230 and felony larceny in violation of North Carolina General Statute § 14-72. Whereas Range sold his deer-hunting rifle upon discovering that he was legally barred from having a firearm due to his 1995 conviction, *Range*, 69 F.4th at 98-99, and there is no indication he ever used his rifle or any other firearm to engage in illegal activity, Davis is alleged to have possessed a loaded firearm, found underneath the driver's seat of his car, after he allegedly threatened his ex-partner with the firearm and followed her to a shopping mall where she was able to contact the police. (Doc. 26, at 6-8). Thus, no factual parallels can be drawn between Range and Davis such that this Court can

find that Davis is "like Range" in any manner aside from the fact that they were both statutorily barred from possessing a firearm due to a prior qualifying criminal conviction.

Applying the legal principles of *Bruen* and *Range*, the Court nonetheless turns to Davis' as applied challenge. Here, in light of *Range*, it is evident that Davis is considered one of "the people" protected by the Second Amendment. This Court further assumes for purposes of this analysis that the Second Amendment's plain text covers Davis' conduct, *i.e.* his possession of a firearm.[4] The Court thus examines the central issue: whether the application of § 922(g)(1) to Defendant Davis is consistent with this Nation's historical tradition of firearm regulation.

The *Bruen* Court provided guidance to aid courts in determining whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation, explaining that "[i]n some cases," the inquiry that courts must undertake to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding "will be fairly

---

[4] The Government argues that the Second Amendment "does not apply because the defendant does not maintain that he possessed a firearm for a lawful purpose." (Doc. 26, at 11; *id*. at 11-13). The Court rejects this argument, which presents an attempt to write a new requirement into the tests set forth in *Bruen* and *Range*. *Cf. United States v. Harper*, 2023 WL 5672311, at *9 (M.D. Pa. 2023) ("even if [Defendant] asserted that he possessed the firearm for the purpose of self-defense, he would still stand accused of violating Section 922(g)(1) because the possession of a firearm for any purpose is a criminal act based on his status as a convicted felon."); *United States v. Quailes*, 2023 WL 5401733, at *8 (M.D. Pa. 2023) ("In a criminal case, a defendant accused of illegal possession of a firearm pursuant to Section 922(g) cannot be required to state his purpose for possessing a firearm without simultaneously admitting the possession, which is an element of the offense. The crux of the Section 922(g)(1) charge is that the mere possession of a firearm is a criminal act due to the defendant's status as a convicted felon.").

straightforward", *Bruen*, 142 S.Ct. at 2131.

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id*.

The Court in *Bruen* nevertheless recognized that while some "historical analogies . . . are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132. "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution – and a Second Amendment – intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs. Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*. at 2132 (internal quotation marks and citations omitted). Thus,

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy – a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two

> regulations are "relevantly similar." And because "[e]verything is similar in
> infinite ways to everything else," one needs "some metric enabling the
> analogizer to assess which similarities are important and which are not[.]"

*Bruen*, 142 S.Ct. at 2132 (internal citations omitted). "[A]nalogical reasoning requires only

that the government identify a well-established and representative historical *analogue*, not a

historical *twin*." *Id*. at 2133 (italics in original). Further, the *Bruen* Court, while declining to

"provide an exhaustive survey of the features that render regulations relevantly similar

under the Second Amendment", explained:

> *Heller* and *McDonald* point toward at least two metrics: how and why the
> regulations burden a law-abiding citizen's right to armed self-defense. As we
> stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the
> *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at
> 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); *see also*
> *id.,* at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central
> to the Second Amendment right"). Therefore, whether modern and historical
> regulations impose a comparable burden on the right of armed self-defense
> and whether that burden is comparably justified are "'*central*'" considerations
> when engaging in an analogical inquiry.

*Id*. at 2132-2133 (italics in original).

In the present case, the Government argues that "[t]here is clear historical support

for restricting the possession of firearms by persons who, like Davis, previously committed

dangerous felonies." (Doc. 26, at 14). In support of this assertion, the Government

presents a series of 17th, 18th, and 19th century purported historical analogues wherein

statutes disarmed individuals who were deemed dangerous, untrustworthy, or unlikely to

abide by the law. (*See id.* at 14-20). Although not expressly stated, it appears both parties

agree that § 922(g)(1) implicates "unprecedented societal concerns", and thus whether a

historical regulation is a proper analogue for § 922(g)(1) "requires a determination of whether the two regulations are 'relevantly similar.'"  *Bruen*, 142 S.Ct. at 2132.[5]  In this as-applied challenge, this Court must therefore determine whether the "how and why" of a traditional historical regulation limiting a particular person's ability to possess a firearm is sufficiently analogous to "how and why" § 922(g)(1) burdens Davis' right to armed self-defense, *i.e.*, whether § 922(g)(1) and the historical regulations set forth by the Government impose a comparable burden on Davis' right of armed self-defense and whether that burden is comparably justified.  *See id.* at 2132-2133.

In *Range*, the Circuit Court rejected the Government's argument that "'legislatures traditionally used status-based restrictions' to disarm certain groups of people" as support for finding a historical analogue to the situation faced by Range, reasoning that:

> Apart from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances. That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be "far too broad[ ]." *See Bruen*, 142 S. Ct. at 2134

---

[5] This Court recognizes, although both parties fail to do so, that the crime of larceny as well as the unlawful possession of a firearm, are both general societal problems that were undisputedly regulated in colonial times.  In determining whether § 922(g)(1) is unconstitutional as applied to a person such as Davis convicted of larceny and unlawful possession of a prohibited firearm, the Court must determine, as the parties seemingly agree, whether there are "unprecedented societal concerns" that justify the disarmament of those who have engaged in these crimes in modern times.  As the Supreme Court acknowledged in *Bruen*, the right to bear arms has been subject to restrictions governing the intent for which firearms could be carried.  In light of the unprecedented concerns regarding the need to disarm those who would use firearms in furtherance of a criminal purpose, *Bruen* specifically recognized that "[t]hroughout modern Anglo-American history, the right to keep and bear arms has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms", 142 S.Ct. at 2138.

(noting that historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there).

*Range*, 69 F.4th at 104-105.

Although the Third Circuit Court found that Range "and his individual circumstances" were not sufficiently analogous to "groups [the founding-era governments] distrusted", the same cannot be said of Davis. As previously set forth, *supra*, Davis is not "like Range." Range was convicted of making a false statement to obtain food stamps, a misdemeanor violation of state law, and was sentenced to probation whereas Davis was convicted of two state law felony offenses and sentenced to serve time in prison. Historically, there is little evidence that the crime for which Range was convicted had any clear founding-era analogue, and even if it did, that it was a crime a consequence of which a person could be barred from the possession of a firearm. Conversely, the same concerns underlying the disarmament of "distrusted" groups such as "Loyalists, Native Americans, Quakers, Catholics, and Blacks" support the prohibition on the possession of firearms by felons convicted of possessing an illegal deadly weapon such as a sawed-off shotgun. *Cf. Range*, 69 F.4th at 112 ("Range committed a small-time offense. He did so with a pen to receive food stamps for his family. There is nothing that suggests he is a threat to society. He therefore stands apart from most other individuals subject to § 922(g)(1) whom we fear much like early Americans feared loyalists. . .") (Ambro, J., concurring).

In her dissent in *Range*, Judge Krause set forth an extensive survey of 17th, 18th,

and 19th century law relating to the prohibition of firearms by certain individuals.[6]  Judge

Krause first noted that "[d]uring the late seventeenth century, the English government

repeatedly disarmed individuals whose conduct indicated that they could not be trusted to

abide by the sovereign and its dictates", *Range*, 69 F.4th at 120 (Krause, J., dissenting).

Thereafter,

> [t]he English notion that the government could disarm those not considered
> law-abiding traveled to the American colonies. Although some of the earliest
> firearm laws in colonial America forbid Native Americans and Black persons
> from owning guns, the colonies also repeatedly disarmed full-fledged members
> of the political community as it then existed – i.e., free, Christian, white men –
> whom the authorities believed could not be trusted to obey the law.

*Id.* at 122.  As colonies became independent during the Revolutionary War, state

legislatures "continued to disarm individuals whose status indicated that they could not be

trusted to obey the law."  *Id*. at 124.  Certain "state legislatures conditioned their citizens'

ability to keep arms on compliance with that civic obligation [to comply with communal

judgments regarding proper behavior], and several states enacted statutes disarming all

those who refused to recognize the sovereignty of the new nation."  *Id*.  Judge Krause's

historical survey is also largely paralleled in Judge Ambro's concurring opinion in *Range*:

> We begin with a look to firearm regulation in the era of the Second
> Amendment's ratification. In England, non-Anglican Protestants and Catholics
> were disarmed during times of tumult. *See Range v. Att'y Gen*., 53 F.4th 262,
> 274-76 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992
> (3d Cir. 2023). The American colonies also disarmed religious dissenters. *See*

---

[6] The Court recognizes that Judge Krause dissented in *Range*, but cites to her thorough historical
review to demonstrate why historical analogues which the majority found to be inapplicable to Range are
nonetheless sufficiently relevantly similar historical analogues to § 922(g)(1) as applied to Davis.

*id*. at 276-77. And in the Revolutionary War period, British loyalists and those who refused to take loyalty oaths were disarmed by several colonies. *See id*. at 277-79. *See also* [*United States v*.] *Jackson*, 69 F.4th [69 F.4th 495, 502-03 (8th Cir. 2023)].

True, those laws are, by today's standards, unconstitutional on non-Second Amendment grounds. But at our Founding they were measures driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed. From this perspective, it makes sense that § 922(g)(1) is presumptively lawful. Society is protecting itself by disarming, *inter alia*, those who murder, rob, possess child porn, and leak classified national security information. *See id*. at 504-06. Most felons have broken laws deemed to underpin society's orderly functioning, be their crimes violent or not. Section 922(g)(1) thus disarms them for the same reason we prohibited British loyalists from being armed.

*Range*, 69 F.4th at 111-112 (Ambro, J., concurring); *id*. at 110 (Judge Ambro stating § 922(g)(1) remains presumptively lawful "because it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society" and explaining that the fact that "Range does not conceivably pose such a threat says nothing about those who do."); *see also, id.* at 115 ("The felon designation . . . serves as a proxy for disloyalty and disrespect for the sovereign and its laws.") (Shwartz, J., dissenting).  *See also*, *United States v. Folajtar v. Att'y Gen.*, 980 F.3d 897, 908 (3d Cir. 2020), *abrogated by Range v. Att'y Gen.*, 69 F.4th 96 (2023), ("[w]hat concerned the Framers was that 'virtuous citizens' retain the right to bear arms. . . ; they had no interest in extending the same guarantee to those who act counter to society's welfare, whether by violent or non-violent acts.") (internal citation omitted); *United States v. Reichenbach*, 2023 WL 5916467, at *6-7 (M.D.Pa. 2023) (setting forth 18th and 19th

20

century laws targeting "groups that lawmakers deemed dangerous and disruptive to society, and [which] were aimed at protecting the public from violence and disorder."); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) ("founding era-legislatures categorically disarmed groups whom they judged to be a threat to the public safety.") (Barrett, J., dissenting).[7]

This Court agrees with the Government's position that a number of historical statutes disarming individuals who were deemed dangerous, untrustworthy, or unlikely to abide by the law are proper historical analogues to § 922(g)(1), and specifically to § 922(g)(1)'s application to Davis (*see* Doc. 26, at 13-22). The analogue rests in the identification by the Government of persons who could be lawfully disarmed, specifically those who were deemed a threat to "the orderly functioning of society", *Range*, 69 F.4th at 110, irrespective of the differences between those who were perceived to fit within that status at the time of the Founding and the ratification of the 14th Amendment and Davis at present.[8]

With respect to the "how" and "why" metrics set forth in *Heller* and re-iterated in *Bruen*, the historical analogues demonstrate that in the 17th and 18th centuries, lawmakers determined that the pre-existing right of an individual to possess a firearm could be

---

[7] The Third Circuit in *Range* expressly declined to determine whether "dangerousness" is the touchstone in determining whether there is a sufficiently analogous statute or regulation permitting the disarmament of certain groups of people. *Range*, 69 F.4th at 104 n. 9.

[8] To find otherwise would almost certainly render § 922(g)(1) inapplicable as applied to any offender. To the extent that a reading of *Bruen* or *Range* would be said to require that the perceived evil or threat justifying the prohibition on the possession of arms must be of the same content, then it may reasonably be said that there is no analogy that can be found given the chasm between those perceived social threats permitting the prohibition of arms in 18th and 19th century America and those of the 20th and 21st centuries.

restricted or prohibited in order to ensure the orderly function of society and prevent

disruptions thereto.  The individuals clearly encompassed within one group of those whose

right could be curtailed were those who could not be trusted to obey the law or who the

legislatures deemed to be dangerous or a threat to public safety.  This group necessarily

includes in today's society individuals convicted of felony offenses involving the possession

of a deadly weapon, in this case, a sawed-off shotgun, a weapon whose lethal properties

have made it an object of specific regulation beyond that of a conventional firearm and

possession of which has not been historically protected as a means of self-defense.  In

modern society, Congress' intent in passing § 922(g) was to curb the "grave problem"

arising from the use of firearms by certain individuals.  As summarized by the Eighth Circuit:

> In the Omnibus Crime Control and Safe Streets Act of 1968, Congress found
> that there was "widespread traffic in firearms moving in or otherwise affecting
> interstate or foreign commerce," and that "the ease with which any person can
> acquire firearms other than a rifle or shotgun (including criminals ..., narcotics
> addicts, mental defectives, ... and others whose possession of such weapons
> is similarly contrary to the public interest) is a significant factor in the prevalence
> of lawlessness and violent crime in the United States." Pub. L. No. 90-351, §
> 901(a)(1), (2), 82 Stat. 225, 225. Congress found that "only through adequate
> Federal control over interstate and foreign commerce in these weapons" could
> "this grave problem be properly dealt with." *Id.* § 901(a)(3).

*Jackson*, 69 F.4th at 504.  It is axiomatic that Congress' concern as to the widespread

trafficking of firearms and its correlation to violent crime encompasses those individuals who

are convicted of a felony crime involving the unlawful possession of a firearm.  Such

individuals, particularly when also having been convicted of a crime of theft, present a clear

example of those persons who are not to be trusted by society.  *See Range*, 69 F.4th at

111-112 ("Society is protecting itself by disarming, *inter alia*, those who murder, rob,

possess child porn, and leak classified national security information. . . .") (Ambro, J.,

concurring); *Kanter*, 919 F.3d at 454 (historical evidence supports proposition "that the

legislature may disarm those who have demonstrated a proclivity for violence or whose

possession of guns would otherwise threaten the public safety.") (Barrett, J., dissenting).

As a result of the foregoing analysis, *Bruen* and *Range* do not aid Davis in

succeeding in his Constitutional challenge to § 922(g)(1).  Range and Davis are not "[a]like"

in any meaningful way and the absence of a historical analogue for disarming a person

convicted of a crime such as making a false statement to obtain food stamps cannot be

reasonably understood to suggest that no historical analogues exist here which are

sufficiently "relevantly similar" such that § 922(g)(1) is unconstitutional as applied to this

defendant.  Although Davis is one of "the people" protected by the Second Amendment and

the plain text of that Amendment covers Davis' conduct of possessing a firearm, the

Government has affirmatively demonstrated that § 922(g)(1) is consistent with this Nation's

historical tradition of firearm regulation as applied to Davis.

### III. CONCLUSION

For the reasons set forth herein, Defendant Davis' Motion to Dismiss the Indictment

(Doc. 22) will be denied.  A separate Order follows.

Robert D. Mariani
United States District Judge